SUPERIOR COURT 
 
 COMMCAN, INC., AND OTHERS[1] V. CHARLIE BAKER, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF MASSACHUSETTS

 
 Docket:
 2084CV00808-BLS2
 
 
 Dates:
 April 16, 2020
 
 
 Present:
 /s/Kenneth W. Salinger Justice of the Superior Court
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 MEMORANDUM AND ORDER DENYING PLAINTIFFS' EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION
 
 

             This case arises from Governor Baker's emergency orders that, to help slow the spread of the novel coronavirus, businesses must suspend physical operations unless he designates them as "essential." The Governor deemed medical marijuana treatment centers (MTCs) and liquor stores to be essential services that may stay open. In contrast, adult-use marijuana establishments must close.
            Plaintiffs contend that it is arbitrary for the Governor to allow sales of medical marijuana and alcohol while barring sales of non-medical cannabis during the current public health emergency. They claim this distinction violates constitutional guarantees of equal protection. Plaintiffs seek an injunction to bar enforcement of these orders against them.[2]
            The Governor's argument that the Court cannot even consider Plaintiffs' claims is without merit. Although the declaratory judgment statute does not apply to the Governor, Plaintiffs may seek injunctive relief to remedy an alleged constitutional violation. Even during an emergency, the Governor does not have unreviewable authority and may not disobey constitutional constraints.
            On the merits, however, the Court must deny this motion because there is little chance that Plaintiffs will succeed in proving their claims. Plaintiffs' equal protection challenge must be evaluated under the so-called "rational basis" test. It was reasonable for the Governor to be concerned that the relatively few adult-use marijuana establishments in Massachusetts are more likely than
---------------------------
[1] The Green Lady Dispensary, Inc.; Ascend Mass LLC; MassGrow, LLC; and Stephen  Mandile.
[2] Though the written motion asks the Court to exempt the entire adult-use marijuana industry from the Governor's emergency orders, at oral argument Plaintiffs clarified that at this time they seek relief only for themselves.
                                                            -1-
liquor stores or MTCs to attract high volumes of customers, including people travelling from other States. The Governor's decision to treat medical marijuana facilities and liquor stores differently than adult-use marijuana establishments has a rational basis and therefore is constitutional.
            Plaintiffs make a convincing showing that there may be other ways to address these concerns that would allow adult-use marijuana establishments to restart their businesses without harming public health or safety —for example by temporarily limiting non-medical marijuana sales to Massachusetts residents who have ordered in advance and arrive during an assigned time-slot, authorizing adult-use retail stores to make curbside deliveries of their products just like medical marijuana treatment centers, and requiring other measures to ensure that customers and workers keep a safe physical distance apart.
            Nonetheless, the Governor was not legally required to implement a different alternative or ensure that his emergency closure orders impose the smallest possible economic burden on adult-use marijuana establishments. The Governor had to craft and issue these orders in rush in order to help protect the people of Massachusetts from a virulent pandemic. Since the choice made by the Governor was constitutional, the Court may not second-guess it.
            1. Preliminary Injunction Standards. "A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To the contrary, "the significant remedy of a preliminary injunction should not be granted unless the plaintiffs had made a clear showing of entitlement thereto." Student No. 9 v. Board of Educ., 440 Mass. 752, 762 (2004).
            Since Plaintiffs ask the Court to constrain government action, they must prove that: (1) Plaintiffs are likely to succeed on the merits of their claims; (2) they will suffer irreparable harm if injunctive relief is denied; (3) when the possible harm to each side is considered in light of Plaintiffs' likely chance of success, the risk of irreparable harm to Plaintiffs if the injunction is denied outweighs the potential harm to the Commonwealth if the injunction is granted; and (4) "the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public." See Garcia v. Department of Hous. & Cmty. Dev., 480 Mass. 736, 747 (2018), quoting Commonwealth v. Mass. CRINC, 392 Mass. 79, 89 (1984); see also Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980).
                                                            - 2 -
            2. Factual Background. The Court credits the affidavits submitted by the parties and takes judicial notice of certain additional orders by the Governor and the Cannabis Control Commission.[3]
            2.1. Orders by the Governor and Commission. The Governor declared on March 10, 2020, that there is a state of emergency in Massachusetts due to the growing outbreak of a novel coronavirus[4] and the disease caused by this virus that is known as COVID-19.
            Five days later the Governor ordered health insurers, HMOs, and the Group Insurance Commission to allow medical providers to deliver "telehealth" services to patients by telephone or video conference, to avoid unnecessary physical contact.[5] Consistent with that order, soon thereafter the Cannabis Control Commission decided that, so long as the Governor's telehealth order remains in place, clinicians may seek and obtain permission from the Commission to certify new medical marijuana patients using telehealth consultations rather than meeting in person.[6]
            The Governor ordered on March 23 that all businesses and other organizations that do not provide "COVID-19 Essential Services" must "close their physical workplaces and facilities ... to workers, customers, and the public" by noon on
---------------------------
[3] The Governor asks the Court to consider the Commission's recent actions. Though the Governor did not present the Commission's orders and bulletins through a sworn affidavit, the Court may and does take judicial notice of these official actions. See generally Commonwealth v. Greco, 76 Mass. App. Ct. 296, 301 n.9, rev. denied, 457 Mass. 1106 and 458 Mass. 1105 (2010) (court may take judicial notice of facts "capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be questioned") (quoting Mass. Guide Evid. § 201(b)(2); see also Fitchburg Gas and Elec. Light Co. v. Department of Pub. Utils., 395 Mass. 836, 856 (1985) (taking notice of recent DPU order).
[4] The official name of this virus is the "severe acute respiratory syndrome coronavirus 2," known for short as SARS-CoV-2.
[5] See "Order Expanding Access to Telehealth Services and to Protect Health Care Providers," dated March 15, 2020, available at: https://www.mass.govidocimarch-15-2020-telehealth-order/download.
[6] See "Bulletin: Telehealth Consultations for New Patients," dated March 20, 2020, available at: https://mass-cannabis-control.com/telehealth-consultationsfor-new-patients-march-20-2020.
                                                            - 3 -
            March 24 and not reopen before noon on April 7, 2020.[7] The Governor subsequently extended this order, barring non-essential businesses from reopening their "brick-and-mortar premises" before May 4, 2020.[8] The second order also revised the list of "COVID-19 Essential Services."[9]
            In both closure orders, the list of essential services that may remain physically open includes "liquor stores" as well as "licensed medical marijuana retailers." "Liquor stores" are listed in the "food and agriculture" category of essential businesses. Medical marijuana retailers—which are also known as "medical marijuana treatment centers" (or MTCs) (see G.L. c. 941, § 1)—are included in the "Health Care / Public Health / Human Services" category. These lists also deem "critical manufacturing" operations, including those "needed for medical supply chains," to be essential.
            Neither the original nor the revised list of essential services exempts nonmedical, adult-use marijuana establishments from the general order to cease doing business.
            The Cannabis Control Commission has issued several orders and bulletins to implement these orders by the Governor.[10]
            MTCs may remain open, consistent with the Governor's express order. Colocated marijuana operations (CMOs), that are licensed to serve both medical and non-medical clients, may continue to sell medical marijuana but were ordered to cease their adult-use operations.[11] MTCs have been allowed since March 28 to make curbside deliveries of their products so that customers
---------------------------
[7] See COVID-19 Order No. 13, available at haps://www.mass.govidocimarch23-2020-essential-services-and-revised-gatherings-order/download.
[8] See COVID-19 Order No. 21, available at https://www.mass.govidoc/march31-2020-essential-services-extensi on-ord er/d own load.
[9] The revised list of COVID-19 Essential Services is available at https://- www.mass.gov/info-details/covid-19-essential-services.
[10] The Commission's orders and bulletins are available at https://mass-cannabiscontrol.com/covid19.
[11] See Bulletin: Operations of MEs and MTCs during COVID-19 (March 23, 2020), available at https://mass-cannabis-control.com/operations-of-mes-and-mtcsduring-covid-19-march-23-2020.
                                                            -4-
need not enter the facility.[12] And the Commission has made clear that workers needed to cultivate and manufacture finished marijuana and marijuana products for the medical marijuana supply chain are considered to be essential and may continue to work.[13]
            Since adult-use marijuana establishments were not deemed "essential" by the Governor, the Commission ordered that all such facilities must cease their retail operations and remain closed until May 4 at noon.[14] Starting April 7, however, adult-use retail, cultivation, and product manufacturing facilities have been allowed to make wholesale sales and transfers of marijuana and marijuana products to MTCs.[15]
            2.2. Effect on Plaintiffs and their Customers.[16] The Governor's emergency orders, and the resulting orders by the Commission, have had the following impacts on the plaintiffs and, where relevant, their clientele.
            The Green Lady Dispensary, Inc., operates an adult-use marijuana establishment in Nantucket; it also cultivates marijuana and manufactures marijuana products. The Green Lady has been forced to close by the Governor's emergency orders. There are no MTCs on the island. Some of The Green Lady's customers rely on it to obtain marijuana for medical purposes; some of them
---------------------------
[12]See Administrative Order Allowing MTCs to Conduct Curbside Operations, (March 27, 2020), available at https://mass-cannabis-control.com/enforcementadmini strati ve-order-allowing-mtcs-to-conduct-curbside-operations-march27-2020.
[13] See Amended Cease and Desist Order (April 7, 2020), available, at https://masscannabis-contracom/wp-con tent/u ploads/2020/04/20200407— Amen dedCease-and-Desist-Order-v-FINAL-Executed.pdf
[14] Id.
[15] Id.
[16] The facts in the first two paragraphs of this section are verified by affidavits. The facts summarized in the rest of this section are undisputed, even though they are set forth in an unverified complaint and not verified by affidavit. For purposes of deciding this motion the Court accepts these undisputed facts to be true. Cf. Temple Emanuel of Newton v. Massachusetts Comm'n Ag. Discrim., 463 Mass. 472, 483-484 (2012) (deciding that ministerial exception to employment discrimination laws applied to plaintiff's claim, based on undisputed facts alleged in apparently unverified complaint).
                                                            - 5 -
have been deprived of access to marijuana for medical purposes since The Green Lady has been forced to close.
            The Green Lady faces a very real prospect of being forced go out of business completely. It has no income. It cannot sell any of its inventory to the medical supply chain because it cannot lawfully transport any marijuana products off Nantucket island. And, like all other marijuana establishments, it cannot participate in any Federal economic relief programs.
            Slang, Inc., operates a retail adult-use marijuana establishment in the City of Pittsfield. It has been forced to close that facility by the challenged orders.
            MassGrow, LLC, operates a Tier-11 adult-use cultivation marijuana establishment. The Governor's orders have the effect of barring MassGrow from selling its product to retail adult-use marijuana establishments.
            Ascend Mass, LLC, has not yet suffered any harm as a result of the challenged orders. Ascend has a provisional state license to operate a retail adult-use marijuana establishment in Boston and a pending application for such a facility in Newton. Since it is not fully licensed, Ascend could not open any facilities yet even if the Governor never issued the challenged orders.
            Stephen Mandile is a military veteran. He has been diagnosed with chronic pain and PTSD as a result of his military service. Mandile experienced negative side effects from taking various prescription opioids. He began using marijuana as an alternative medical treatment and within several months was able to stop using all but one of his prescription drugs. Marijuana is an essential part of his medical treatment. Mandile purchases his marijuana at adult-use marijuana establishments that are reasonably accessible to his home. Mandile would have to travel over an hour to visit the nearest MTC.
            A large majority of Massachusetts military veterans use marijuana for therapeutic purposes and have been able to reduce their use of opioids and other unwanted prescription and over-the-counter medication as a result. Many veterans report financial difficulties in obtaining medical cannabis cards. Many others are scared to be placed on a state medical cannabis registry because they fear this will cause them to lose their federal Veterans
                                                            - 6 -
Administration benefits. As a result, many veterans in Massachusetts rely upon the adult-use market to obtain marijuana for therapeutic purposes.[17]
            After retail adult-use outlets were forced to close, the Cannabis Control Commission has been receiving a surge in new medical marijuana patient registrations. This strongly suggests that many people who benefit medically from using marijuana previously obtained their supply from adult-use outlets rather than from MTCs.[18]
            3. Legal Background. Plaintiffs do not challenge the Governor's authority under the present dire circumstances to declare a public health emergency and to order that, for the time being, business that he does not identify as essential must remain closed. They claim only that the Governor acted arbitrarily by allowing liquor stores and medical marijuana treatment centers to remain open but requiring adult-use marijuana establishments to close.
            The following legal principles apply to the Governor's exercise of emergency powers and in considering Plaintiffs' equal protection claims.
            3.1. Police Power to Stem Epidemics. States may exercise their police power to impose quarantines and other reasonable restrictions to protect the public health, including to limit the spread of a highly infectious and very dangerous disease. Faced with a serious threat of disease, the Commonwealth has broad power to restrain personal liberty and the use of private property in order to protect public health. See Commonwealth v. Pear, 183 Mass. 242, 244-245 (1903), aff'd sub nom. Jacobson v. Massachusetts, 197 U.S. 11, 25 (1905). In the Pear case, for example, the Supreme Judicial Court upheld mandatory vaccinations
---------------------------
[17] The Court credits the testimony and opinions by Dr. Marion McNabb. The Governor's assertion that the Court should disregard this affidavit because Plaintiffs have no standing to seek redress on behalf of cannabis users who are not parties to this lawsuit is unavailing. This evidence is relevant to the issue of whether the plaintiff adult-use marijuana establishments and MTCs are similarly situated for purposes of Plaintiffs' equal protection claims.
[18] The Court credits statements to that effect by the Commission's Executive Director and by its Chairman in a State House News Service article published by the Boston Globe and submitted by the Plaintiffs. They are relevant as discussed in footnote 17, above. Reliable hearsay statements in newspaper articles and other documentary sources may be considered and credited by a judge in deciding whether to issue a preliminary injunction. See Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406 Mass. 701, 711 & n.9 (1990).
                                                            - 7 -
required to stem a smallpox outbreak. Pear, 183 Mass. at 248. After further review, the United States Supreme Court agreed. Jacobson, 197 U.S. at 26-28.
            The Pear/Jacobson case concerned a statute providing that, if a local board of health determined that mandatory vaccinations were necessary for the public health or safety, anyone (other than minors or persons under guardianship) who neglected or refused to be vaccinated could be fined or imprisoned. Pear, 183 Mass. at 248; Jacobson, 197 U.S. at 26-27. The Cambridge board of health ordered all city residents to be vaccinated for smallpox. Pear at 243; Jacobson at 24. The SJC and Supreme Court held that this order was reasonably necessary, and thus constitutional, because smallpox was prevalent and increasing in the city. Pear at 243-245; Jacobson at 28.
            The same legal principles apply here. "[A] community has the right to protect itself against an epidemic of disease which threatens the safety of its members." Jacobson, supra, at 27. As the Supreme Court has further explained, "in every well-ordered society charged with the duty of conserving the safety of its members[,] the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." Id. at 29.
            3.2. Equal Protection Constraints. The Supreme Court has cautioned, however, that a requirement or restriction adopted to protect public health would be unconstitutional and =enforceable if it "was arbitrary and not justified by the necessities of the case." Jacobson, 195 U.S. at 28. As the Court explained, "it might be that an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all, might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons." Id.
            These limitations on emergency powers follow from the constitutional requirements of equal protection imposed by the Fourteenth Amendment to the United States Constitution and arts. 1 and 10 of the Massachusetts Declaration of Rights. See generally Finch v. Commonwealth Health Ins. Connector Auth., 459 Mass. 655, 662 (2011); Commonwealth v. Franklin Fruit Co., Inc.,
                                                            -8-
388 Mass. 228, 229-230 (1983).[19] These federal and state guarantees of equal protection are essentially identical and claims seeking to enforce them must be evaluated in the same way. See Commonwealth v. Weston W, 455 Mass. 24, 30 n.9 (2009) ("The standard for equal protection analysis under our Declaration of Rights is the same as under the Federal Constitution.") (quoting Brackett v. Civil Serv. Comm 'n, 447 Mass. 233, 243 (2006)).
            Government action will violate the constitutional guarantee of equal protection if it imposes or enforces "'arbitrary or irrational' classifications." Gillespie v. City of Northampton, 460 Mass. 148, 159 (2011), quoting Pinnick v. Cleary, 360 Mass. 1, 28 (1971). The general mandate of equal protection is that "all persons similarly situated should be treated alike." Id., quoting City of Cleburne, Texas v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).
            This case does not involve any claim of invidious discrimination that significantly interferes with a fundamental right or targets a suspect class. "The right to pursue one's business" is not a "fundamental right" under the equal protection clause; therefore government regulation that bars certain economic activity will survive an equal protection challenge if "it is rationally related to the furtherance of a legitimate State interest." Roche v. Director of Div. of Marine Fisheries, 76 Mass. App. Ct. 733, 740 (2010), quoting Route One Liquors, Inc. v. Secretary of Admin. & Fin., 439 Mass. 111, 120-121 (2003).
            In other words, the classifications established by the Governor will pass constitutional muster if they have a rational basis, but will be unconstitutional if they are arbitrary and capricious. See generally Doe v. Secretary of Education, 479 Mass. 375, 393-395 (2018); Murphy v. Department of Correction, 429 Mass. 736, 742 (1999). This is a very deferential standard of review. Under the rational basis test, courts may not judge or question the "wisdom or desirability" of
---------------------------
[19] The Fourteenth Amendment to the United States Constitution provides that "No state shall ... deny to any person within its jurisdiction the equal protection of the laws." Article 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments, provides in part that "All people are born free and equal, and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness." Article 10 of the Declaration of Rights states in part that "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws."
                                                            - 9 -
economic regulations. New Orleans v. Dukes, 427 U.S. 297, 303-304 (1976); accord Steinbergh v. Rent Control Bd. of Cambridge, 410 Mass. 160, 164 (1991).
            A statute that bars some kinds of business from operating at certain times, while allowing others to do so, is constitutional so long as the distinctions or exemptions "have a rational basis consistent with the statutory purpose." See Zayre Corp. v. Attorney General, 372 Mass. 423, 438 (1977) (exemptions to law restricting retail operations on Sundays were not so arbitrary as to deny equal protection of law); accord, e.g., Chebacco Liquor Mart, Inc. v. Alcoholic Beverages Control Comm'n, 429 Mass. 721, 722-723 (1999) (same).
            But such a statute is unconstitutional if it "makes an arbitrary distinction between businesses" that are essentially alike with respect to any "attributes relevant to such classification." See Hall-Omar Baking Co. v. Commissioner of Labor and Industries, 344 Mass. 695, 707 (1962) (statute requiring itinerant hawkers and peddlers to obtain license could not constitutionally be applied to bakery truck drivers-salespeople, because statute arbitrarily exempted household delivery of dairy products but not bakery goods).
            These same principles apply here, even though we are dealing with executive orders rather than a statute. See, e.g., Massachusetts Prisoners Ass'n Political Action Comm. v. Acting Governor, 435 Mass. 811, 819-823 (2002).
            4. Analysis and Conclusions. In ordering thousands of business temporarily to close their physical facilities, the Governor was exercising powers granted to him by the Massachusetts Civil Defense Act. See St. 1950, c. 639, as amended. This statute authorizes the Governor to exercise "very extensive and highly flexible powers" if he declares a state of emergency. See Director of Civil Defense Agency and Office of Emergency Preparedness v. Civil Service Commission, 373 Mass. 401, 404 (1977).
            The orders challenged here are within the scope of the Governor's broad emergency powers, perhaps especially with respect to adult-use marijuana establishments and other businesses that need a state license. The Legislature has authorized the Governor to "exercise any and all authority over persons and property" necessary to meet a state of emergency. St. 1950, c. 639, § 7. And the Legislature specified that the Governor may, among other things, restrict or regulate gatherings of people to protect public safety, regulate the sale of food and household articles, and vary the terms or conditions of licenses issued by state or local agencies. Id. ¶¶ (g), (o), and (p).
                                                            - 10 -
            The plaintiff businesses nonetheless claim that the challenged orders are unlawful as applied to them. As noted, Plaintiffs contend it is arbitrary and capricious to allow liquor stores and medical marijuana treatment centers (MTCs) to stay open but not exempt adult-use marijuana establishments from the closure orders. Count I of Plaintiffs' complaint asserts that in so doing the Governor violated the equal protection clause of the Fourteenth Amendment to the United States Constitution. Count II alleges he violated the essentially identical guarantees of equal protection in the Massachusetts Declaration of Rights. The other two counts of the complaint add nothing of substance, so there is no need to consider them separately.[20]
---------------------------
[20] In Count III, Plaintiffs allege that the challenged aspect of Governor's orders exceeded his emergency powers under the Massachusetts Civil Defense Act. But Plaintiffs' memorandum of law and oral argument make clear that the sole basis for this claim is the assertion that the Governor's distinction between adult-use marijuana establishments and industries that Plaintiffs contend are similarly situated is arbitrary and capricious. This is the same legal issue raised by Plaintiffs' equal protection claims.
Plaintiffs' characterization of this claim— as asserting that the Governor's orders are not authorized by the Act to the extent they are arbitrary or capricious—makes sense. Since the Act gives the Governor broad discretion to issue orders needed to protect the public health and safety, decisions by the Governor made pursuant to that statute do not need to meet the "substantial evidence" standard established by G.L. c. 30A; instead, judicial review of whether the Governor had reasonable grounds to exercise powers under the Act is governed by the "arbitrary and capricious" standard. Cf. Flomenbaum v. Commonwealth, 451 Mass. 740, 747 (2008) (same under statute authorizing Governor to remove public officers "for cause").
Count IV, which seeks preliminary and permanent injunction relief, "adds nothing" to the prayer for injunctive relief on the other claims; it "states a claim for a remedy, not a cause of action." See Unitrode Corp. v. Linear Tech. Corp., Middlesex Sup. Ct. civil action 98-5983, 11 Mass. L. Rptr. 145, 2000 WL 281688, at *5 (Mass. Sup. Ct. 2000) (Botsford, J.); accord, e.g., Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 353 n.3 (1st Cir. 2013) ("injunctive relief is not a stand-alone cause of action in Massachusetts"); Long v. Dell, Inc., 93 A.3d 988, 1004 (R.I. 2014) ("An injunction is a remedy, not a cause of action.") (affirming dismissal of claims); Goerlitz v. City of Maryville, 333 S.W.3d 450, 455 (Mo. 2011) (en banc) (same, affirming summary judgment).
                                                            -11-
            4.1. Subject Matter Jurisdiction. The Governor contends that the Court does not have jurisdiction to consider a claim for declaratory judgment against the Governor. He argues that the Court therefore has no power to decide this case.
            The starting premise of this argument is correct. The Plaintiffs labelled all three of the substantive counts in their complaint as claims for declaratory judgment. By statute declaratory relief is not available against the Governor. See G.L. c. 231A, § 2 (declaratory judgment procedure authorized by statute "shall not apply to the governor").
            But Plaintiffs also seek temporary or permanent injunctive relief. So long as the Court has power to grant that kind of relief against the Governor, the fact that the declaratory judgment statute does not apply to the Governor is beside the point. Since a complaint need not "state the correct substantive theory of the case," the reference to declaratory judgment "does not preclude relief on other legal theories." See Gallant v. City of Worcester, 383 Mass. 707, 709 (1981).
            The Governor cites to four prior cases in which the Supreme Judicial Court dismissed claims for declaratory judgment against the Governor. In each of those cases, however, complete relief was available against other defendant state officials and the SJC did not have to address whether some other kind of relief could be obtained against the Governor. See Town of Milton v. Governor, 416 Mass. 471, 471 n.2 & 475 (1993); Alliance, AFSCME/SEIU, AFL-CIO v. Secretary of Admin., 413 Mass. 377, 377 n.1 (1992); Powers v. Secretary of Admin., 412 Mass. 119, 119 n.2 (1992); Barnes v. Secretary of Admin., 411 Mass. 822, 822 n.2 (1992).
            Even though a Governor's alleged violation of equal protection may not be subject to declaratory judgment action under G.L. c. 231A, that does not mean the Governor may violate the constitution with impunity. "The absence of a statutory remedy for the violation of constitutional rights cannot absolutely and in all cases bar judicial protection of those rights." Phillips v. Youth Dev. Program, Inc., 390 Mass. 652, 658 n.4 (1983). The Governor, like the rest of the Executive Branch, "may not violate a person's constitutional rights and then fairly assert that no redress can be had because the State has not provided a statutory means of enforcing those rights." See Layne v. Superintendent, Massachusetts Corr. Inst., Cedar Junction, 406 Mass. 156, 159-160 (1989).
            When the Governor issues an executive order, it may be challenged on the grounds that it is unconstitutional or otherwise unlawful. See Massachusetts
                                                            - 12 -
Prisoners Ass'n Political Action Comm., 435 Mass. at 819-823 (reaching merits of constitutional equal protection challenge to executive order barring political fundraising in prisons); see also Flomenbaum, 451 Mass. at 747 (reaching merits of claim that Governor's order firing chief medical examiner was arbitrary and capricious and therefore unlawful).
            The Court recognizes that Massachusetts courts may not issue orders in the nature of mandamus commanding a Governor to take some particular action. See Town of Milton, 416 Mass. at 475; Rice v. The Governor, 207 Mass. 577, 578580 (1911). But Plaintiffs do not seek that kind of relief. They ask the Court to hold the Governor's recent emergency orders may not lawfully be enforced against the plaintiff businesses because doing so would be unconstitutional.
            The fact that the challenged orders were issued under the Governor's broad emergency powers does not mean that they are immune from judicial review.
            The Supreme Court has observed "that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens," and held that the federal courts may consider and decide whether actions taken by the President under his war powers to constrain United States citizens violate the constitution. Hamdi v. Rumsfeld, 542 U.S. 507, 536 (2004) (O'Connor, J.) (plurality opinion) (United States Citizens held as enemy combatant after capture during military operations in Afghanistan had due process right to contest factual basis for detention); see also id. at 541 (Souter, J.) (concurring in plurality's rejection of claimed limit on exercise of habeas jurisdiction).
            Similarly, nothing in the Civil Defense Act allows a Governor to take actions during a state of emergency that violate the constitutional rights of Massachusetts residents and business. Massachusetts courts have jurisdiction to consider and decide claims that a Governor has done so.
            Even if Plaintiffs could not seek injunctive relief against the Governor, which they may, Plaintiffs could nonetheless achieve the same result by adding as defendants the Cannabis Control Commission, the Attorney General, and any other official who might enforce the emergency order against adult-use marijuana establishments. If Plaintiffs were entitled to relief, but needed to add defendants to obtain it, the Court would allow Plaintiffs' oral motion to do so. But as explained below, Plaintiffs are not entitled to a preliminary injunction because they are unlikely to succeed in proving that Governor acted unlawfully. So it would be pointless to add other defendants.
                                                            - 13 -
            4.2. Likelihood of Success. Plaintiffs may not obtain preliminary injunctive relief if they cannot prove that they are likely to succeed on the merits of their claims. See, e.g., Fordyce v. Town of Hanover, 457 Mass. 248, 266 (2010) (vacating preliminary injunction); Wilson v. Commissioner of Transitional Assistance, 441 Mass. 846, 858-859 (2004) (same).
            Furthermore, the Plaintiffs have the burden of showing they are likely to prevail on the merits. See, e.g., Berrios v. Dept. of Pub. Welfare, 411 Mass. 587, 598 (1992). In other words, the Governor is not required to prove that his emergency orders are lawful. Instead, to obtain a preliminary injunction the Plaintiffs must demonstrate they are likely to succeed in proving that the Governor's closure of adult-use marijuana establishments is unlawful.
            4.2.1. Similarly Situated. The Court concludes that adult-use marijuana establishments, MTCs, and liquor stores are all "similarly situated" with respect to whether they should be exempt from the Governor's emergency closure orders, so that treating them differently implicates constitutional equal protection requirements. Cf. Gillespie, 460 Mass. at 159. The Court credits Plaintiffs' evidence that many people who need to use marijuana to manage medical conditions obtain their marijuana from adult-use retail outlets rather than from MTCs. And no doubt others who have used and enjoyed marijuana for non-medical reasons treat marijuana and alcohol as imperfect substitutes.
            The Commonwealth makes a plausible argument that these three kinds of businesses are nonetheless not similarly situated as a matter of constitutional law because they are subject to materially different regulatory regimes. Though retail adult-use marijuana establishments compete at least to some degree against MTCs and liquor stores, "competing in the same market is not sufficient to conclude that entities are similarly situated." DIRECT'V, LLC v. Department of Revenue, 470 Mass. 647, 653 n.10 (2015), quoting National Ass 'n of Optometrists & Opticians LensCrafters, Inc. v. Brown, 567 F.3d 521, 527 (9th Cir. 2009). Depending on what kind of regulation is at issue, businesses that are taxed differently and subject to materially different licensing requirements—as is true of liquor stores, adult-use marijuana establishments, and MTCs—may not be similarly situated for purposes of evaluating whether disparate treatment among them is constitutional. Cf. Id., 470 Mass. at 657-662.
            But the regulatory differences among liquor stores and marijuana establishments are not relevant to whether each type of business is essential to its clientele and can operate under present circumstances without unduly
                                                            - 14 -
threatening public health. The Legislature has reasonably subjected alcohol, medical marijuana, and adult-use (non-medical) marijuana to very different regulatory regimes. Nonetheless, sellers of these products are similarly situated for the purpose of evaluating whether it is arbitrary to close businesses. See Hall-Omar Baking Co., 344 Mass. at 707 (though milk was subject to a special minimum pricing statute that did not apply to baked goods, companies selling those products were similarly situated for purpose of deciding whether it was arbitrary to exempt milk vendors but not bakery salespeople from hawker's and peddler's license requirement).
            4.2.2. Rational Basis and Less Burdensome Alternatives. The Governor offers two main justifications for not exempting retail adult-use marijuana establishments from his closure orders. One is that, because at present relatively few such businesses are licensed to open, they have tended to attract large crowds of customers. The other is that, because non-medical marijuana cannot be purchased in bordering states, Massachusetts adult-use sales outlets also attract many customers from out of state travelling into Massachusetts.[21]
            Plaintiffs convincingly argue that both of these concerns could be addressed without compelling all adult-use marijuana establishments to remain closed.
            Retail sellers of adult-use marijuana could readily adopt new business models that guard against close personal contact. The Commonwealth's own evidence shows that, before the Governor halted non-medical sales of marijuana, at least one seller had successfully reduced its line of waiting customers by limiting sales to those who ordered ahead, which also allowed it to increase customer spacing in the outside lines. The Commission now allows MTCs to deliver
---------------------------
[21] Plaintiffs' assertion at oral argument that the Court may not consider the first of these rationales, because the Governor did not rely upon it when he issued the emergency closure orders, has no merit. For a classification to pass muster under equal protection rational basis review, "the State need not articulate its reasoning at the moment a particular decision is made." Board of Trustees of Univ. of Alabama v. Garrett, 531 U.S. 356, 367 (2001). Indeed, the State "need not 'actually articulate at any time the purpose or rationale supporting its classification.' "Heller v. Doe by Doe, 509 U.S. 312, 320 (1993), quoting Nordlinger v. Hahn, 505 U.S. 1, 15 (1992). "Instead, a classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' "Id. quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993); accord Chebacco Liquor Mart, 429 Mass. at 723.
                                                            - 15 -
medical marijuana curbside to customers who have ordered ahead; it could allow or even mandate a similar model for adult-use outlets. Other businesses now schedule customers to pick up their orders during designated one-hour windows. The adult-use marijuana industry could do the same.
            And the Court assumes, without deciding, that to help abate the coronavirus emergency the Governor could lawfully restrict sales of non-medical marijuana to Massachusetts residents, without violating the so-called dormant Commerce Clause of the United States Constitution.[22]
            The dormant Commerce Clause bars States from engaging in "economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." Department of Revenue of Kentucky v. Davis, 553 U.S. 328, 337-338 (2008), quoting New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273-274 (1988); accord West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 192 (1994).
            A temporary ban on marijuana sales to out-of-state residents in order to help stem the spread of the novel coronavirus would not disadvantage out-of-state competition, and thus would not be the sort of rule that is subject to close scrutiny as a result of this constitutional protection of interstate commerce.
            The mere fact that such a rule would affect interstate commerce does not mean it would be unconstitutional. See Commonwealth v. B & W Trans p. Inc., 388 Mass. 799, 807 (1983). "The limitation imposed by the Commerce Clause on state regulatory power 'is by no means absolute,' and 'the States retain authority under their general police powers to regulate matters of "legitimate local concern," even though interstate commerce may be affected.' "Maine v. Taylor, 477 U.S. 131, 138 (1986), quoting Lewis v. BT Investment Managers, Inc., 477 U.S. 27, 36 (1980). State rules that affect interstate commerce but do not discriminate
---------------------------
[22] "The commerce clause provides that 'congress shall have power ... to regulate commerce ... among the several States.'" Murphy v. Massachusetts Turnpike Auth., 462 Mass. 701, 711-712 (2012), quoting U.S. Const., Art. I, § 8, cl. 3. "The Clause has long been understood to have a negative implication 'that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." Id. at 712, quoting Perini Corp. v. Commissioner of Revenue, 419 Mass. 763, 767, cert. denied sub. nom Adams v. Perini Corp., 516 U.S. 822 (1995). "This 'negative command [is] known as the dormant Commerce Clause." Id. quoting Capital One Bank v. Commissioner of Revenue, 453 Mass. 1, 10, cert. denied, 129 S.Ct. 287 (2009).
                                                            -16-
against out-of-state economic interests are unconstitutional only if they impose "a burden on interstate commerce that 'is clearly excessive in relation to the putative local benefits.' "Murphy v. Massachusetts Turnpike Auth., 462 Mass. 701, 712 (2012), quoting Davis, 553 U.S. at 338-339.
            States may bar the entry of, or impose a quarantine upon, people or animals from outside the State that have a dangerous infectious disease. See generally Oregon-Washington R. & Nay. Co. v. State of Washington, 270 U.S. 87, 94-95 (1926); accord Maine v. Taylor, 477 U.S. at 137-148 (upholding ban on importation of baitfish into Maine that was adopted to protect native fisheries from parasitic infection and adulteration by non-native species).
            If States may exclude people and baitfish to protect the health of local residents and native fish species, it seems likely that the Commonwealth could temporarily restrict adult-use marijuana sales to Massachusetts residents to help stem a public health emergency without violating the Commerce Clause.
            But none of this means that the lines drawn by the Governor are irrational. Plaintiffs cannot prevail by showing that adult-use marijuana establishments could safely be reopened with limitations such as requiring all customers to pre-order and barring sales to out-of-state residents. "[E]qual protection does not demand that a State employ less burdensome alternatives if those are available." Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 146 (1st Cir. 2001). Even assuming the Governor could accomplish the same public safety goals in a way that imposed less of a burden on the Plaintiffs, that would not make the Governor's emergency orders unconstitutional. Id.
            Since the rational basis test applies here, the classifications made by the Governor may satisfy the requirements of equal protection "even where the lines of distinction seem imprecise or improvident and where it appears that, had the line been drawn differently, a more just outcome would have resulted." Murphy, 429 Mass. at 741. "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect" or it enforces a rule that "results in some inequality." Id., quoting Dandridge v. Williams, 397 U.S. 471, 485 (1970).
            These legal rules doom Plaintiffs' constitutional claims. The Court may not bar enforcement of the Governor's emergency orders against the plaintiff businesses on the ground that the Governor could have achieved a similar public health benefit while allowing Plaintiffs to stay open. Economic rules do
                                                            -17-
not have to be perfectly tailored, even in non-emergency situations. See Dandridge, 397 U.S. at 485; Keough v. Director of Div. of Emp. Sec., 370 Mass. 1,5 (1976). "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." Dandridge, supra, quoting Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69-70 (1913).
            Since Plaintiffs have failed to show they are likely to succeed on the merits of their claims, there is no need to address whether they may suffer irreparable harm if the requested preliminary injunctive relief is not granted, or whether the requested relief would be consistent with the public interest. See Fordyce, 457 Mass. at 266-267 (need not reach public interest); Wilson, 441 Mass. at 858 (need not reach irreparable harm).
ORDER
            Plaintiffs' emergency for a preliminary injunction is DENIED.
@/s/Kenneth W. Salinger Justice of the Superior Court
@April 16, 2020
                                                            - 18 -
xxz